# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| v. | ) | **Criminal Case No. 13-cr-131 (RJL)** |
| | ) | |
| **AARON THORPE, and** | ) | |
| **MELVIN KNIGHT,** | ) | **FILED** |
| | ) | |
| Defendants. | ) | **MAR 11 2019** |

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

## MEMORANDUM OPINION
(March 7, 2019) [Dkt. ## 127, 128]

On July 31, 2013, after a seven-day trial, defendants Aaron Thorpe ("Defendant Thorpe") and Melvin Knight ("Defendant Knight") were found guilty by a jury of nine counts each of being a felon in possession of a firearm, conspiracy, assault with a dangerous weapon, kidnapping while armed, burglary while armed, possession of a firearm during a crime of violence, and obstruction of justice. Both raised a number of challenges to their convictions and sentences on appeal, including claims that their Superior Court trial counsel were constitutionally deficient.[1] Our Circuit Court affirmed defendants' convictions and sentences, but remanded their ineffective-assistance-of-counsel ("IAC") claims for me to consider in the first instance. To that end, I held three days of evidentiary hearings on May 24 and 25, and September 20, 2017, after which I accepted post-hearing briefing in the form of motions to vacate the convictions based on ineffective assistance of Superior Court counsel. Ultimately, the briefing was completed on May 24, 2018.

---

[1] *United States v. Knight*, 824 F.3d 1105 (D.C. Cir. 2016).

1

Because Thorpe and Knight's IAC claims ultimately stem from the same allegation of the insufficiency of Thorpe's Superior Court trial counsel, Frederick Iverson, I will consider them together. Having closely reviewed the evidence presented during three days of evidentiary hearings and in the parties' extensive briefing, Thorpe and Knight's IAC claims are, for the reasons set forth below, **DENIED**.

## BACKGROUND

### A. Superior Court Proceedings

On January 28, 2013, police arrested Thorpe and Knight for the D.C. Code offense of kidnapping while armed, among other things. In all of their Superior Court proceedings, Defendant Thorpe was represented by David Knight ("Attorney Knight"), while Defendant Knight was represented by Frederick Iverson ("Attorney Iverson"). Defendants were held without bond pending a preliminary hearing in the Superior Court. At the February 1, 2013 preliminary hearing, the federal prosecutor stated that the Government had "extended a plea offer to one count of Assault With A Deadly [sic] Weapon to both defendants." 2/1/13 Transcript, Government's Motions Hearing Exhibit 1. The next time defendants appeared before the Superior Court was February 19, 2013, when Assistant United States Attorney Britten Shaw told the court that the Government's understanding was that defendants would not be accepting the pre-preliminary hearing plea and there would be no further plea offers at that time. 2/19/13 Transcript, Government's Motions Hearing Exhibit 2, at 2–3. The case was therefore set for trial in the Superior Court on May 15, 2013.

## B. Federal Court Trial and Appeal

On May 7, 2013, a federal grand jury indicted each defendant with the federal offense of felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1), as well as the D.C. code offenses of conspiracy, assault with a dangerous weapon, two counts of armed kidnapping, first-degree burglary while armed, two counts of possession of a firearm during a crime of violence, and obstruction of justice. The defendants' Superior Court charges were subsequently dismissed on May 10, 2013. At a June 4, 2013 status hearing before this Court, Assistant United States Attorney Emory V. Cole communicated his understanding that "defendants are not amenable to even discussing a non[-trial] disposition...the defendants have indicated they want to go to trial." 6/4/13 Transcript, Status Hearing, at 4. Both defendants were assigned new defense counsel in the federal proceeding—Shawn Moore represented Defendant Knight while Joseph Conte represented Defendant Thorpe.

Two months later, after a seven-day trial, a jury convicted both defendants on all counts. The Government's evidence at trial established that on the night of January 28, 2013, Thorpe and Knight donned masks and police-like attire and lay in wait for Edmund Peters and his female companion—Luttitia Fortune. Brandishing weapons, the defendants assaulted Peters and Fortune and forced them into Peters' apartment. Their alleged purpose was to steal narcotics and cash from Peters' drug trafficking operation. Fortunately, a next-door neighbor witnessed the altercation outside Peters' apartment entrance and called the police station to let them know their officers were having a difficult time. When the police arrived, they surrounded the apartment and ordered those inside to come out. The

3

defendants, in response, threatened Peters and Fortune in an effort to get them to fabricate a false story to law enforcement about the events that had transpired. To say the least, the police never fell for their concoction of lies.

On March 10, 2014, I sentenced Thorpe to 300 months' imprisonment. Thorpe Judgment [Dkt. # 84] at 3. I sentenced Knight to 268 months' imprisonment. Knight Judgment [Dkt. # 86] at 3. Prior to sentencing, defendants requested new counsel on the grounds that they would have never been brought to federal court had their Superior Court attorneys provided effective assistance. I granted defendants' requests for new counsel but told them that sentencing would not wait for any habeas motions to be filed, assuming they went forward with those motions at all. Howard Katzoff appeared for Defendant Thorpe and Chris Davis appeared for Defendant Knight, respectively, at their sentencings, and in their subsequent appeal and remand for IAC claims.[2]

On appeal, Knight and Thorpe raised several challenges. First, they raised a challenge claiming a violation of the Speedy Trial Act ("STA"). Second, Thorpe argued that the 25-year sentence I gave him was unreasonable. And third, both defendants argued that they received ineffective assistance of counsel from their Superior Court counsel regarding the wired plea offer they received in the Superior Court. *United States v. Knight*, 824 F.3d 1105, 1109 (D.C. Cir. 2016). Our Circuit Court rejected defendants' other challenges but remanded their IAC claims for me to consider in the first instance. *Knight*, 824 F.3d at 1113.

---

[2] Mary Davis appeared in place of Chris Davis as counsel for Defendant Knight in two of the three post-conviction evidentiary hearings.

## C. Post-Conviction Evidentiary Hearings

Following our Circuit's remand, defendants moved for a waiver of attorney-client privilege with respect to their Superior Court counsel—Attorney Iverson and Attorney Knight—which I granted. I ordered the production of documents related to defendants' representation in Superior Court, including billing records, jail visit records, hearing transcripts, and communications between counsel and the government regarding the plea offer. I then held three days of evidentiary hearings on May 24, May 25, and September 20, 2017. Attorneys Iverson and Knight testified about their interactions with defendants between the initial Superior Court hearing on February 1, 2013 and the hearing at which the prosecutor represented that defendants had rejected the wired plea deal on February 19, 2013. Defendants Thorpe and Knight also testified, as did the D.C. Jail Custodian of Records.

<u>Testimony of Attorney Iverson</u>

Attorney Iverson testified that he had practiced as a CJA attorney in Superior Court since 1998, handling "somewhere between 80 and 100-plus cases a year." 5/24/17 Tr. 80–82. He first spoke with Knight for "five" or "six minutes" at the January 29, 2013, presentment in Superior Court. 5/24/17 Tr. 84. While he "[didn't] have any recollection of the actual events of [Knight's] presentment," 5/24/17 Tr. 85–86, Attorney Iverson testified that at a typical presentment,

> You can talk to them briefly. Tell them what they have been charged with. You're basically introducing yourself, telling them about the process, you're going to try to get them out, whether you believe, based on the charges, they'll probably be held, what the next step will be as far as them coming to court for a preliminary hearing,

things of that nature, find out if they have any family in the audience, or who you're going to be contacting. But that's pretty much what goes on at that point.

5/24/17 Tr. 85. After the presentment, Iverson testified that, on January 31, 2013, he received an email "from Trevor McFadden, [Assistant] United States Attorney at that time...spell[ing] out the pre-preliminary hearing plea offer that the government was making at that time." 5/24/17 Tr. 87. That same day, Attorney Iverson testified that he visited Defendant Knight at the D.C. Jail to discuss the Government's plea offer, among other things. 5/24/17 Tr. 91–92, 100.

Afterwards, Iverson testified that he met with Defendant Knight "several times" to discuss the case. 5/24/17 Tr. 88.[3] Iverson's billing records reflect that on February 1, 2013, he "conference[d] [client" at the courthouse, and also "conference[d] co-defendant attorney, conference[d] government attorney and family." 5/24/17 Tr. 96. He also met with Defendant Knight, co-counsel, and the prosecutors on February 19, 2013, before the hearing, for roughly an hour in total. 5/24/17 Tr. 97–98, 126. On cross, Attorney Iverson was asked whether he had any record of meeting with Defendant Knight between the hearings on February 1 and February 19. The Government produced evidence that he visited the jail on February 5, 2013, but Iverson had neither billing records memorializing that visit nor any independent recollection of that visit. 5/24/17 Tr. 120–21.[4] Attorney

---

[3] Though he had no direct recollection of the number or nature of their meetings, Attorney Iverson's billing records reflect that he did in fact meet with Knight at the D.C. Jail on 1/31/13, 3/22/13, 3/26/13, 4/5/13, 4/13/13, 4/22/13, and 5/7/13. 5/24/17 Tr. 97–99. He also met with Knight at the courthouse on 2/1/13 and 2/19/13. 5/24/17 Tr. 97–98.

[4] Indeed, much of Mr. Iverson's testimony was inconclusive. He testified that he suffered a head injury in 2004 due to a motorcycle accident, and that there are instances in which his memory has been "affected" as a result. 5/24/17 Tr. 150–51.

Iverson testified that he "believe[d] [his] billing records are accurate." 5/24/17 Tr. 100.

Attorney Iverson could not recall the exact details of what he discussed with Defendant Knight about the plea offer. On the one hand, Iverson testified that he found out the case was going to federal court "abruptly" at the hearing on February 19, 2013. 5/24/17 Tr. 133. He testified that he "wasn't focused on the possibility of him going over to Federal Court and weighing those options with [Defendant Knight]," because he was focused on "preparing our case to go to trial in D.C. Superior Court." 5/24/17 Tr. 147. Attorney Iverson further stated that there was "nothing in [the government's plea] letter to make [him] focus on the federal side." 5/24/17 Tr. 147.

Yet, on the other hand, Attorney Iverson testified that in a typical case he "would have discussed the plea offer" with his client, 5/24/17 Tr. 92, including "the terms of the plea offer," *id.* at 100, "possible penalties," *id.* at 102, "what are the maximum penalties," *id.*, and "what his co-defendant would do or not do." *Id.* at 103. Attorney Iverson had "some recollection of some conversations with [Defendant Knight] about the case…going over some of the strengths and weaknesses about the evidence[,] what [they] expected the evidence to be at trial, talking to [Knight] about some of the weaknesses in defenses, what [he] thought would be the strength of the government's case, [and] why [he] thought [they] wouldn't prevail on certain issues." 5/24/17 Tr. 100–01. Iverson specifically recalled Defendant Knight being "hopeful that Mr. Peters would not cooperate with the government or would not testify" against him." 5/24/17 Tr. 112–13. When asked if he had discussed

the nature of the wired plea offer with his client, Iverson did not "have an independent recollection of explaining to [Knight] wired [pleas]; and that [ ] he can't get the deal unless his co-defendant takes the deal." 5/24/17 Tr. 103.

After reviewing a transcript of the February 19, 2013 hearing, Iverson recalled that "[a]t that time" of the hearing, "we were not accepting the plea offer, m'am no. If we were accepting it, I would have spoken up and said, we don't want to go forward with a preliminary hearing, we want the plea offer." 5/24/17 Tr. 111, 115–16. Iverson testified "that was the decision my client and I had made–my client had made" after "discuss[ing] his options." 5/24/17 Tr. 110–11. He insisted, "I don't make the decision." 5/24/17 Tr. 110. Once Defendant Knight was indicted in federal court, Iverson testified that he "wouldn't have been his lawyer at that point," regardless of Knight's satisfaction with his representation, "because I'm not admitted in Federal Court. And once it leaves D.C. Superior Court, it's not my case anymore, and that's the end of my representation." 5/24/17 Tr. 115.

Testimony of Defendant Knight

Defendant Knight testified that, had he been given an adequate opportunity, he would have taken the plea offer extended to him in Superior Court. 5/24/17 Tr. 40. Knight recalled that during Attorney Iverson's initial visit to him on January 31, 2013 for "close to 20 minutes," 5/24/17 Tr. 16, 53, they discussed the hearing the next day and the possibility of getting "some type [of] release." 5/24/17 Tr. 54. At the time, Defendant Knight admitted that being released was his "whole focus." 5/24/17 Tr. 17. He recalled asking Attorney Iverson about possible alternatives to incarceration such as "a halfway

8

house, some type of bond or ankle bracelet, even PR possibly on the charges that [he] was facing." 5/24/17 Tr. 17.[5]

During the preliminary hearing the next day, Defendant Knight testified that Iverson told him that "the case was going to be postponed." 5/24/17 Tr. 18. This news made Defendant Knight "upset" because he was "trying to get home" and wanted Attorney Iverson to "push forward." 5/24/17 Tr. 18. Attorney Iverson told Knight to "calm down" and conveyed that the Government had made a plea offer for one count of assault with a dangerous weapon (ADW). 5/24/17 Tr. 18–19. When Defendant Knight asked his counsel "how much time do they want for that?," Iverson responded, "[t]en years." 5/24/17 Tr. 19, 56. Defendant Knight testified that his response was: "I've been locked up for three days, I'm not copping to that shit." 5/24/17 Tr. 19, 56–57. According to Defendant Knight, he and Attorney Iverson did not discuss any other details of the maximum or minimum penalties, sentencing guidelines, or other potential charges during that February 1, 2013 hearing. 5/24/17 Tr. 19–20.

Defendant Knight testified that the next time he saw his attorney was the day of the February 19, 2013 hearing. 5/24/17 Tr. 24. In the cell block before the hearing, Attorney Iverson asked Knight if he would "agree to another postponement," but Knight refused because he "didn't agree to the first one and [Iverson] didn't come up to the jail to see [him] during the last postponement." 5/24/17 Tr. 25. Defendant Knight re-emphasized that the "only thing [he] wanted to do was see [his] wife have [his] son." 5/24/17 Tr. 25.

---

[5] On cross, Knight testified that he also told Attorney Iverson that he was concerned his supervised release might be revoked in an unrelated federal case. 5/24/17 Tr. 53–54.

Defendant Knight testified that the first time he learned of potential federal court charges was at the hearing itself, when the Government attorney stood up to tell the Superior Court judge that the plea deal had been rejected. 5/24/17 Tr. 27; *see also id.* at 22–24 (testifying that the prosecutor mentioned offenses that were "different from what [his] attorney told him"). On cross, Defendant Knight admitted that he never told his attorney he wanted to accept the plea deal because he "[didn't] know if the [prosecutor] [was] telling the truth" and "Mr. Iverson never brought plea deal to [him] of that magnitude." 5/24/17 Tr. 58–59. Knight also admitted that at no point did he ask for more time to consider the Government's plea offer. 5/24/17 Tr. 59. After the February 19, 2013 hearing, Defendant Knight testified that he still wanted Attorney Iverson to "move forward" to "see where the case was going" so that he could be released to see his newborn son. 5/24/17 Tr. 60. Defendant Knight also testified that he subsequently rejected another plea deal offered to him in his federal court case. 5/24/17 Tr. 65–66.

On May 15, 2013, shortly after he was indicted in federal court, Defendant Knight testified that he sent a letter to D.C. Bar Counsel complaining about Attorney Iverson's conduct in the Superior Court. 5/24/17 Tr. 30–31; *see also* Defendant Knight's Motions Hearing Exhibit 1, May 2013 Letter to Bar Counsel. Chief among Knight's complaints was that he only saw Attorney Iverson before court on February 1 and 19, 2013, but at no time in between. 5/24/17 Tr. 30–31. The letter also stated that Iverson "tried to fast-talk [him] on a plea deal in D.C. Superior Court, in open court" but that he "refused." 5/24/17 Tr. 30.

<u>Testimony of D.C. Jail Custodian of Records</u>

The D.C. Jail Custodian of Records, Jennifer Postell, testified about the legal visit sheets logging Attorney Iverson's visit to the D.C. Jail from 9:56 pm (21:56) on January 31, 2013, to 3:50 pm (15:50) on February 1, 2013, to see Defendant Knight. 5/24/17 Tr. 74. Describing why the length of the logged visit was so different from Attorney Iverson and Defendant Knight's testimony, Ms. Postell explained that if an attorney does not hand back the log sheet, the "computer will automatically kick the visit out after 24 hours." 5/24/17 Tr. 74. Ms. Postell admitted that the sheet "doesn't state for sure…that [defendant] was seen." 5/24/17 Tr. 77.

<u>Testimony of Attorney Knight</u>

Defendant Thorpe's attorney, David Knight ("Attorney Knight"), testified that he has worked in the D.C. Public Defenders' Office since graduating law school in 2009, and was practicing primarily in Superior Court in 2013 when he was appointed to be Thorpe's counsel on January 29, 2013. 9/20/17 Tr. 50–51. Attorney Knight testified that he visited Defendant Thorpe that same day in the cellblock to introduce himself and let him know "how that day would go" at Thorpe's initial appearance. 9/20/17 Tr. 53–54. Between then and the February 1, 2013 hearing, Attorney Knight testified that he also met with Thorpe at the D.C. Jail to discuss "allegations of what happened," "what a preliminary hearing would be like, and his potential chances of getting released at the preliminary hearing." 9/20/17 Tr. 55. On the day of the hearing, Attorney Knight and Defendant Thorpe discussed "the fact that a plea offer had been made and discuss[ed]…that the government was offering to continue the preliminary hearing so [Thorpe] could consider the plea offer."

9/20/17 Tr. 57. Defendant Thorpe "agreed that it was okay to continue the preliminary hearing so [they] could have a fuller conversation about the plea offer." 9/20/17 Tr. 57. Attorney Knight testified that he met with Thorpe "[a]t least twice" between February 1 and February 19, 2013, 9/20/17 Tr. 58, and would have "talk[ed] more extensively about the plea offer and possible sentences" at those meetings, *id.* at 76–77, as well as the fact that "the plea was a wire[d]" one, *id.* at 60, "mean[ing] that every defendant has to take whatever plea offer they were made for you to take your own plea." *Id.* at 61. Attorney Knight also specifically recalled telling Defendant Thorpe about the possibility of federal charges, although he "was not in a position to really tell him what exactly those charges would look like or how much time they would carry." 9/20/17 Tr. 62.

Prior to the February 19, 2013 hearing, Attorney Knight recalled having a conversation with co-defendant's counsel, Attorney Iverson, about the wired plea. *Id.* at 63. His "understanding from [Iverson] was that he did not expect [Defendant] Knight to take the plea." 9/20/17 Tr. 63. Attorney Knight testified that he took Attorney Iverson "at his word" when he told him "he [didn't] think his client [was] going to take a plea" and did not "try to convince him about how to counsel his client." 9/20/17 Tr. 107. Afterwards, Attorney Knight recalled that he also "spoke to the government about trying to unwire the plea and they said no." 9/20/17 Tr. 64. Attorney Knight admitted that he never asked the Government for another plea deal because the prosecutor had already made clear that they were unwilling to offer a non-wired plea. 9/20/17 Tr. 71. He then "went back to see Mr. Thorpe" in the cell block to update him on these developments—that "Mr. Iverson…didn't expect [Defendant] Knight to accept the plea" and that the Government was unwilling to

12

unwire the plea. 9/20/17 Tr. 64. Attorney Knight wanted to "talk[] about what [Thorpe's] options were based on that information." 9/20/17 Tr. 64. Attorney Knight recalled that it was his impression from Attorney Iverson that Defendant Knight "may have had…time hanging over his head in another jurisdiction, and…was concerned about getting additional time." 9/20/17 Tr. 68.

Attorney Knight testified that, at that point and time, both attorneys were "under the impression that [Defendant] Knight was running the show." 9/20/17 Tr. 71. Attorney Knight believed that his own client, Defendant Thorpe, was "open to the plea," 9/20/17 Tr. 64, but was concerned about Defendant Knight's "reaction," *id.* at 64–65, and did not want to appear "hot." *Id.* at 66, 89–90. As a result, Attorney Knight recalled that he and Defendant Thorpe decided to "represent in court that [Defendant Thorpe] wasn't rejecting the plea, [but] he wasn't saying he was accepting the plea." 9/20/17 Tr. 65–67. Had Defendant Knight taken the plea, Attorney Knight believed his client also "would have also taken the plea." 9/20/17 Tr. 86–87.

<u>Testimony of Defendant Thorpe</u>

Defendant Thorpe testified that Attorney Knight met with him to discuss the plea offer several times between the February 1 and February 19, 2013 hearings in the Superior Court. 9/20/17 Tr. 13–14. He recalled that Attorney Knight explained the nature of the "wired" plea, specifically "saying that both co-defendants had to take it or no one could take it at the time." 9/20/17 Tr. 14. Defendant Thorpe also testified that his attorney "discussed the potential Sentencing Guidelines for the ADW plea offer" and the charges Thorpe would be facing if he did not accept the plea bargain. 9/20/17 Tr. 15. While he

"wanted to take [the plea]," Defendant Thorpe testified that he "also wanted to talk to [his] family and let them know at the time that this decision I was getting ready to make…to let them know that it was a possibility that I was about to do some more time." 9/20/17 Tr. 15–16. Because of that, he did not instruct Attorney Knight to tell the Government he was accepting the plea at that time. 9/20/17 Tr. 16. At the February 19, 2013 hearing, Defendant Thorpe testified that Attorney Knight whispered in his ear that "the government was no longer extending the plea bargain, and it was coming off the table." 9/20/17 Tr. 19. He also understood that the Government "was [sic] seeking District Court charges." 9/20/17 Tr. 20. He realized that this put him "in a worst [sic] predicament than [he] already was [in]." 9/20/17 Tr. 20–21. Defendant Thorpe admitted on cross that he was arrested in the instant case only 21 days after being released from federal prison for another conviction on December 31, 2012. 9/20/17 Tr. 26–27.

After the testimony presented at these three post-conviction evidentiary hearings, defendants asked for an extension of time to file their ineffective assistance motions, which I granted. Defendant Knight submitted his motion on February 2, 2018, Knight Motion to Vacate Conviction Based on Ineffective Assistance of Superior Court Counsel ("Knight Mot.") [Dkt. # 127], and Defendant Thorpe submitted his motion on February 9, 2018. Thorpe Motion to Vacate Conviction Based on Ineffective Assistance of Superior Court Counsel ("Thorpe Mot.") [Dkt. # 128]. The Government responded on April 2, 2018. Memorandum in Opposition by USA ("Govt. Opp.") [Dkt. # 130]. After requesting additional extensions, defendants finally filed their replies on April 29, 2018, Thorpe Reply in Support of Ineffective Assistance Motion ("Thorpe Reply") [Dkt. # 134], and May 24,

2018, Knight Reply in Support of Ineffective Assistance Motion ("Knight Reply") [Dkt. # 136], respectively.

## STANDARD OF REVIEW

The parties agree that defendants' claims—that inadequate assistance of counsel caused them to reject a plea offer in the Superior Court—are governed by the usual standard applicable to IAC claims raised on direct appeal. *See Missouri v. Frye,* 566 U.S. 134, 140 (2012); *Strickland v. Washington,* 466 U.S. 668, 687, 694 (1984); *United States v. Gray-Burriss,* 251 F. Supp. 3d 13, 17 (D.D.C. 2017) (applying *Strickland* standard following remand of IAC claims after direct appeal). "[T]he negotiation of a plea bargain is a critical phase of litigation for purposes of the Sixth Amendment right to effective assistance of counsel." *Frye,* 566 U.S. at 141 (internal citation omitted).

To raise a colorable claim for ineffective assistance of counsel, a defendant must allege facts sufficient to "show two things: (1) that counsel's performance was deficient, and (2) that the deficient performance prejudiced the defense." *In re Sealed Case,* 901 F.3d 397, 404 (D.C. Cir. 2018) (quoting *United States v. Anderson,* 632 F.3d 1264, 1268 (D.C. Cir. 2011)); *see also Strickland,* 466 U.S. at 687. The defendant shoulders the burden of proof as to both elements. *See, e.g., Knowles v. Mirzayance,* 556 U.S. 111, 122 (2009) ("[A] defendant must show both deficient performance by counsel and prejudice in order to prove that he has received ineffective assistance of counsel[.]").

Under *Strickland*'s deficiency prong, I must determine whether counsel acted "reasonabl[y] under prevailing professional norms . . . considering all the circumstances." *Strickland,* 466 U.S. at 688; *see Padilla v. Kentucky,* 559 U.S. 356, 366 (2010) (deficiency

is "necessarily linked to the practice and expectations of the legal community"). Yet as our Circuit Court has observed, "the standard for constitutionally effective representation is not overly rigorous." *United States v. Catlett*, 97 F.3d 565, 570 (D.C. Cir. 1996); *see also Hinton v. Alabama*, 571 U.S. 263, 272 (2014) (attorney performance need only "meet[ ] . . . a minimal standard of competence"). "Judicial scrutiny of counsel's performance must be highly deferential," and courts must be vigilant against the "all too tempting" lure "to second-guess . . . counsel's defense after it has proved unsuccessful." *Strickland*, 466 U.S. at 689. There are, after all, "countless ways to provide effective assistance in any given case." *Id.* Therefore, a court must proceed cautiously with the "presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal quotation omitted). Rebutting this presumption is "never an easy task." *Padilla*, 559 U.S. at 371; *see also Strickland*, 466 U.S. at 690 ("[S]trategic choices made after a thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]").

"To show prejudice from ineffective assistance of counsel where a plea offer has lapsed or been rejected," defendants must "show a reasonable probability that the *end result* of the criminal process would have been more favorable" had they accepted the plea. *Frye*, 566 U.S. at 147 (emphasis added); *see also Lafler v. Cooper*, 566 U.S. 156, 163 (2012) ("In the context of pleas[,] a defendant must show the outcome of the plea process would have been different with competent advice."). Speculative alternative outcomes will not suffice; *Strickland* requires a "reasonable probability" that is "sufficient to undermine confidence in the outcome." 466 U.S. at 669. This entails showing not only a "reasonable

probability" that a defendant "would have accepted the earlier plea offer," but also "a reasonable probability neither the prosecution nor the trial court would have prevented the offer from being accepted or implemented." *Frye*, 566 U.S. at 146. Where a plea is wired, this means each defendant must "show a reasonable probability that either the government would have waived that condition or his co-defendant would have been willing to plead guilty on the government's terms." *Benitez v. United States*, 60 A.3d 1230, 1237 (D.C. 2013). "This further showing is of particular importance because a defendant has no right to be offered a plea, nor a federal right that the judge accept it." *Frye*, 566 U.S. at 148–49 (internal citations omitted).

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla*, 559 U.S. at 371. Because "[f]ailure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim," *Strickland*, 466 U.S. at 700, courts need not "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697; *see also United States v. Gwyn*, 481 F.3d 849, 854 (D.C. Cir. 2007) (finding that where defendant "suffered no prejudice from trial counsel's [alleged deficiency], we need not decide whether counsel's performance in this respect was objectively unreasonable"). It follows that in most cases it will be "very difficult for a convicted defendant to prevail on a claim of ineffective assistance of counsel." *United States v. Moore*, 703 F.3d 562, 574 (D.C. Cir. 2012).

## ANALYSIS

The allegations in this case arise from the conduct of defendants' Superior Court counsel in plea negotiations that took place between February 1, 2013 and February 19,

2013. Defendants allege that Attorney Iverson provided ineffective assistance of counsel in advising Defendant Knight about the consequences of rejecting the Government's wired plea offer, and that both defendants suffered prejudice as a result.

I begin by observing, as I did during defendants' post-conviction evidentiary hearings, "that there is no case in the Supreme Court, D.C. Circuit, there is no Bar Counsel opinion in our circuit, that we know of, that addresses what constitutes effective assistance of counsel in this type of situation," where two defendants were offered a wired plea in Superior Court, rejected it, and ultimately faced conviction on federal charges. 5/25/17 Tr. 34. Following the two-part test in *Strickland*, I must first determine (1) if defendants' Superior Court counsel performed deficiently during plea negotiations; and (2) if so, whether defendants suffered prejudice as a result.

## A. Deficiency of Attorney Iverson in Advising Defendant Knight of Consequences of Rejecting Plea Offer

Defendant Knight argues that his Superior Court counsel's performance was deficient in namely one respect—that his counsel did not fully advise him of the consequences of rejecting the government's initial plea offer. Knight Mot. at 6–7. Defendant Knight argues that the only time Iverson discussed the plea offer with him was at counsel's table during the February 1, 2013 hearing in the Superior Court. *Id.* at 3. According to Knight, he was disappointed to find out the potential sentence was 10 years because his wife was about to have a baby. *Id.* Defendant Knight argues that even though Attorney Iverson told him that he would come talk to him at the jail, he received no visits from counsel between February 1 and February 19, 2013, when the Government rescinded

18

the plea offer. *Id.* Defendant Knight alleges that he "was not informed about maximum penalties, minimum penalties, the Voluntary Superior Court Guidelines, or potential additional charges." *Id.* at 7–8. Moreover, Knight argues that he "was not aware of the plea details or risk of a federal trial," *id.* at 7, pointing to Attorney Iverson's testimony that he himself was surprised at the possibility that charges could be brought in federal court. *Id.* at 4.

The Government argues that the record shows that Attorney Iverson's counsel was effective. Govt. Opp. at 27–28. While he could not recall the exact details of his conversations with Defendant Knight, Attorney Iverson testified that, in a typical case, he would discuss the charge, the "possible" and "maximum" penalties, whether the government had placed any limits on itself, the Voluntary Sentencing Guidelines, and what his clients could expect if they accepted the plea. 5/24/17 Tr. 101–02, 132. The Government argues that Defendant Knight has not presented conclusive, contemporararaneous evidence that Attorney Iverson departed from this general practice. Govt. Opp. at 28.

The standard under *Strickland* is what was "reasonable under prevailing professional norms . . . considering all the circumstances." *Strickland*, 466 U.S. at 688; *see Padilla*, 559 U.S. at 366 (deficiency is "necessarily linked to the practice and expectations of the legal community"). In the context of plea rejections, our Circuit has advised that these norms could include advising a defendant on the "worst-case scenario if he rejected the plea and went to trial." *United States v. Aguiar*, 894 F.3d 351, 361 (D.C. Cir. 2018) (remanding for evidentiary hearings on IAC motion). Yet even in *Aguiar*, our

Circuit emphasized that the defendant would need to proffer "contemporaneous evidence" of counsel's deficiencies in advising him of the consequences of rejecting a plea offer. *Id.* (citing *Lee v. United States*, 137 S. Ct. 1958, 1967 (2017)).

The question therefore before me is: whether Defendant Knight has shown "contemporaneous evidence" that his counsel failed to raise the specter of potential federal charges to inform the decision to reject the plea offer. The record is, admittedly, somewhat confused on this point. On the one hand, Attorney Iverson testified that he would normally have informed defendants of something like federal charges in the course of plea discussions with his client. 5/24/17 Tr. 103, 107–08. Yet on the other hand, Attorney Iverson could not specifically recall telling Defendant Knight about any of the details of the plea, including that it was wired, the potential guidelines range, and the possibility of federal charges. 5/24/17 Tr. 132–35. Perhaps more tellingly, Iverson admitted to being "surprised" when the prosecutor raised the possibility of federal charges at the February 19, 2013 hearing, 5/24/17 Tr. 133, because that was the first he had heard of federal charges. 5/24/17 Tr. 132–33. Defendant Knight himself insists that he never knew he could be tried in federal court. 5/24/17 Tr. 27–28.

While I take defendant's testimony with a grain of salt, I find that it is bolstered here by contemporaneous complaints of Attorney Iverson's performance filed shortly after the federal indictment. Defendant Knight's Motions Hearing Exhibit 1, May 2013 Letter to Bar Counsel. The letter details two crucial pieces of evidence in particular: (1) that Iverson never visited defendant between February 1 and February 19, 2013, and (2) that Iverson supposedly tried to "fast talk him" into a plea deal at counsel's table. Even allowing for

the latitude that courts must give to counsel in every case, I find that this evidence, when coupled with counsel's testimony that he was unaware of the possibility of federal charges, strongly suggests that counsel did not adequately advise defendant the "worst-case scenario if he rejected the plea and went to trial." *Aguiar*, 894 F.3d at 361. I therefore find that Attorney Iverson's performance was deficient in advising Defendant Knight of the potential consequences of rejecting the plea.

## B. Prejudice to Defendant Knight of Counsel's Deficient Performance

Because I find that Attorney Iverson's counsel was deficient, I must now turn to *Strickland's* prejudice prong. The Supreme Court has advised that under *Strickland's* prejudice analysis, the possibility of an alternative result must "be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011). Defendant Knight argues that he was prejudiced by counsel's deficient performance because the potential sentence under the D.C. Code assault with a dangerous weapon charge was much lower than potential sentences under the federal and other D.C. Code violations. Knight Mot. at 9. Knight further argues that "there is no evidence to suggest that the judge would have rejected the plea or that the government would have independently rescinded the offer." *Id.* Defendant Knight insists "he would have taken the plea at the time." *Id.*

The Government argues that Defendant Knight's "mere allegation" that he would have proceeded to trial but for counsel's alleged deficiencies is not enough to entitle him to relief. Govt. Opp. at 31 (quoting *Heard v. Allison*, 728 F.3d 1170, 1182 (10th Cir. 2013)). According to the Government, Knight has failed to establish prejudice because there is no indication that he would have accepted the plea at the time of the hearing. The

Government argues that Knight "was never going to 'cop' to a plea...[r]ather, his sole interest was getting released." Govt. Opp. at 31–32.

Like many other Courts, I remain "suspicious of bald, post hoc and unsupported statements that a defendant would have changed his plea absent counsel's errors." *See, e.g.*, *Heard*, 728 F.3d at 1184 ("the ultimate issue [remains] whether *the defendant* would have changed his plea") (internal citation omitted). Here, Defendant Knight's insistence that he would have taken the plea if he had known about the federal charges faces two notable obstacles.

First, there is "contemporaneous evidence" that Defendant Knight was not inclined to take the plea because he wanted to be released. Defendant Knight, by his own admission, was wholly focused on one thing: getting released so he could go home and see his wife and son. 5/24/17 Tr. 17. He did not want any additional time to consider or discuss the plea, but instead pushed Attorney Iverson to "move forward." 5/24/17 Tr. 60. Defendant Knight's May 2013 letter to Bar Counsel does not indicate anything to the contrary. Rather, it indicates that Defendant Knight told Bar Counsel that when Attorney Iverson had "tried to fast-talk [him] on a plea deal in D.C. Superior Court, in open court," he had "refused" the plea offer. Defendant Knight's Motions Hearing Exhibit 1, May 2013 Letter to Bar Counsel. Complaints about fast-talking go to deficiency, not prejudice. Defendant Knight also told Attorney Iverson he was "hopeful" the victim in the case—Edmund Peters— would not testify against him.[6]  5/24/17 Tr. 112–13. Defendant Knight had, after all,

---

[6] Attorney Iverson and Defendant Knight's post-conviction testimony in inconsistent on whether Knight thought Peters would cooperate with law enforcement. *Compare* 5/24/17

"known [Peters] for a while." 5/24/17 Tr. 46. These are all strong indicators that Defendant Knight was in no mind to accept the Government's initial plea offer, even had he been fully informed of the consequences.

Second, the Government presented evidence at the post-conviction hearings that Defendant Knight subsequently rejected a plea offer in his federal case. *See* 6/4/13 Transcript, Status Hearing, 4 (prosecutor stating that "[i]t appears that defendants are not amenable to even discussing a nontrial disposition...the defendants have indicated they want to go to trial"). If defendants both rejected a plea offer made weeks after their federal indictment, it borders on pure "speculation" that they were of a mind to accept a non-trial disposition at all. *United States v. Mathis*, 503 F.3d 150, 152 (D.C. Cir. 2007).

Admittedly, our Circuit recently recognized that the "loss of the plea opportunity [that] led to a trial resulting in a conviction on more serious charges [and] the imposition of a more severe sentence" *could* give rise to a colorable prejudice claim. *Aguiar*, 894 F.3d at 360. In *Aguiar*, the defendant faced a 35-year mandatory minimum as a result of rejecting the plea. *Id.* Here, Knight ultimately faced more severe penalties than one ADW charge to be sure,[7] though not so severe as in *Aguiar*, but he must still prove that different

_____

Tr. 64–65 *with* 5/24/17 Tr. 112–13. But, to say the least, Defendant Knight's testimony is at odds with other facts in the case, including that defendants robbed Peters because Knight knew him, and that defendants tried to convince Peters and Fortune to lie to the police afterwards.

[7] Here, Defendant Knight ultimately faced the prospect of Superior Court charges with a 10-year mandatory minimum and a federal charge with no mandatory minimum. The Government concedes that the sentences defendants ultimately received—268 months for Knight and 300 months for Thorpe–were more severe than the potential sentences they would have received had they accepted the ADW plea. *See* Govt. Mot. at 31 (citing D.C. Code § 22-402 statutory maximum for ADW of 120 months or 10 years).

23

advice by counsel would have actually induced him to take the plea. Unfortunately, Defendant Knight cannot make the showing that, had he had known of the possibility of federal sentencing, he would have resolved *not* to go to trial. In fact, the record strongly suggests otherwise.

### C. Deficiency of Attorney Knight's Conduct in the Context of a Wired Plea

Defendant Thorpe does not contend that his counsel, like Defendant Knight's, was deficient in advising him of the details of the plea offer; rather, Thorpe contends that his "counsel was deficient in other respects." Thorpe Mot. at 8–9. In a somewhat novel twist on traditional IAC claims, Defendant Thorpe argues that in a wired-plea situation such as this, his counsel was obliged to "protect against prejudice spilling over from [his] co-defendant's case," similar to an attorney's obligation to request severance during trial if there is a risk of prejudice to his client. *Id.* at 17. To provide effective assistance, Defendant Thorpe insists that his attorney was required to "meet[] with co-defendant's counsel in wired-plea situations to discuss the status, and perhaps to try to effectuate a change of heart." *Id.* at 6, 8, 10, 20; *see also* Thorpe Reply at 3. Thorpe seemingly dismisses the discussions between counsel at the courthouse, in which Iverson conveyed his "impression" that Defendant Knight would not accept the plea offer. Thorpe Mot. at 10. Defendant Thorpe contends that these efforts were insufficient. *Id.* at 6. He also suggests that his counsel should have done more to meet with the Government, above and beyond simply asking the Government to unwire the plea. *Id.* at 8.

The Government insists that Attorney Knight's representation was more than adequate for effective assistance of counsel. Attorney Knight discussed the plea offer with

his client, including the Superior Court guidelines, the fact the plea offer was wired, and the other charges Thorpe "could potentially be indicted on and how much time those charges and offenses would carry." 9/20/17 Tr. 59–60, 76–77. Unlike Attorney Iverson, Attorney Knight specifically discussed the possibility of federal charges with his client when explaining the consequences of rejecting the plea. Govt. Opp. at 29. And of course, he did meet with both co-counsel and the AUSA to "ask[] her if she would unwire the plea, and she said no." 9/20/17 Tr. 63–64, 67.

In my judgment, Defendant Thorpe seeks to set the standard for effective counsel very high indeed. What Thorpe asks for, in so many words, is for this Court to find ineffective counsel if an attorney does not ultimately change a co-defendant's mind. That I cannot do. The record evidence shows that Attorney Knight did everything required for effective assistance, and more. He met with his own client multiple times to explain and discuss the plea. He met with co-counsel to discuss whether Defendant Knight would accept the plea. He met with the Government to ask them to unwire the plea. To ask him to do more would be the type of "post-hoc" Monday morning quarterbacking that this Court cannot, and will not, engage in. Because I find that Attorney Knight's counsel was fully effective, I need not reach the issue of prejudice as to Defendant Thorpe.

## CONCLUSION

For the foregoing reasons, defendants' claims that their Superior Court counsel were constitutionally deficient are **DENIED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued herewith.

RICHARD J. LEON
United States District Judge